*975 OPINION OF THE COURT
Joseph J. Maltese, J.
This court denies the defendants’ motions to dismiss the non-New York plaintiffs based upon CPLR 327 (a) because New York is the most convenient forum to adjudicate these coordinated pharmaceutical products liability mass tort cases.
Procedural History
On July 8, 2005, the New York Litigation Coordinating Panel issued a coordination order that directed that this court coordinate all discovery and pretrial matters concerning all cases with the prescription pain medication OxyContin pending before the courts of the various counties in New York. The coordination order applied to all OxyContin cases then in existence, as well as any future OxyContin lawsuits brought in New York State courts. Subsequent to the issuance of the coordination order, the plaintiffs’ lawyers filed 1,117 lawsuits in this court of which 193 were brought by New York residents and the remaining 924 non-New York plaintiffs were from various states, as well as from Canada, Guam and the United Kingdom. In February 2006 the Purdue defendants, the manufacturer of OxyContin, moved this court to dismiss the 924 lawsuits brought by out-of-state plaintiffs on the ground of forum non conveniens. While that motion was sub judice the defendants conducted negotiations with the plaintiffs’ attorneys to attempt a universal settlement for all of the 1,117 cases. However, on January 19, 2007, prior to the execution of the necessary settlement agreement documents, this court denied defendants’ forum non conveniens motion to dismiss the out-of-state plaintiffs.[1]
In October 2007 Purdue learned that only one plaintiff, Sharon Ann Andre-Drake, a resident of Davenport, Iowa, refused to execute the settlement documents. Subsequent to this revelation, Purdue filed a motion for leave to renew its forum non conveniens motion because of a change of circumstances. Concurrently, Andre-Drake’s counsel filed a motion to be relieved as counsel for a breakdown in communication with the client. This court issued an order dated January 11, 2008 relieving Andre-Drake’s counsel and further ordered that her complaint would be dismissed unless within 30 days she obtained new counsel to continue the lawsuit. Ms. Andre-Drake never retained another attorney, nor did she ever communicate *976 with this court. Based on that decision this court denied the Purdue defendants’ motion for leave to renew their forum non conveniens motion as moot. Consequently, Purdue withdrew its appeal of the January 19, 2007 order denying dismissal of the out-of-state cases.
In August of 2007 the law firm of Sanders Viener Grossman LLP (Sanders firm) started another round of cases by filing 19 cases against Purdue, wherein only one of the plaintiffs was a New Yorker. Purdue moved to dismiss all of the 18 nonresident plaintiffs from these coordinate actions on the ground of forum non conveniens. But before oral argument on those motions took place, the Sanders firm filed an additional 258 cases, bringing the total number of cases to 277, of which 29 plaintiffs are New York residents.
The plaintiffs have agreed to dismiss the actions against the corporate officers and the parties have agreed to have this issue of forum non conveniens decided for all of the now 248 nonresident plaintiffs in this second round of cases.[2]
Discussion
At the heart of the OxyContin pharmaceutical products liability actions before this court are allegations that as a result of the ingestion of OxyContin tablets, the plaintiffs suffered severe physical and mental injuries to include nausea and addiction to OxyContin, which led to numerous consequential damages to include loss of jobs, divorce and suicide. While the plaintiffs did not ingest the drug at the same times, these cases are similar to other mass toxic torts. Judge Jack Weinstein of the U.S. District Court for the Eastern District of New York, who is renowned for his handling of mass torts, stated in the DES mass tort cases[3] that lawsuits such as those brought by the plaintiffs are governed by
“a doctrine analytically distinct from negligence in a conscious attempt to adapt tort law to the development of an economy of mass marketed, mass produced consumer goods, modern cases and statutes operate within the parameters marked by Judge *977 Cardozo even as they advance the cause of injured plaintiffs and seek to protect defendants against the unfair imposition of liability.”[4]
Judge Weinstein stated further that “[t]rue mass torts . . . raise qualitatively different and more intractable problems. These cases typically involve the torts of a post-industrial age, the so-called mass toxic torts . . . The litigation complexities raised by mass torts are legion.”[5] By virtue of the complicated nature associated with mass tort litigation, the legislature cannot create procedural rules for every possible issue that may arise during the course of a mass tort trial.
Courts trying mass tort claims are placed in a position to innovate solutions for both plaintiffs and defendants that respect the rule of law and the principles of judicial economy. In the instant matter, defendants argue that this court should grant their forum non conveniens motion, because not to do so would “effectively create[ ] a nationwide Multidistrict (state) Litigation (MDL) venue for OxyContin litigation.”[6] Defendants argue that should this court not find in their favor, the very core of our federal separation of powers between the state and federal judiciary will be violated. Yet, the defendants do not contest that this court has jurisdiction to decide this matter. Instead, the defendants argue that the standard of judicial scrutiny employed in evaluating claims of forum non conveniens is greater than mere jurisdiction and venue issues.
The defendants cite to Justice Carol Robinson Edmead’s trial court decision in Jordan v Pfizer, Inc.[7] and Justice Martin Shulman’s decision in Wilson v Pfizer, Inc.[8] to support their position that New York courts should not entertain suits brought by nonresident plaintiffs against corporations that qualify as New York residents for the purposes of litigation on the ground of forum non conveniens. However, those cases are not applicable in the context of mass toxic torts. Unlike the case at bar, the Jordan case involved five nonresident plaintiffs, none of which was a New York resident, who complained of the ill effects of Viagra, the male virility enhancing drug. Hence, in that instance, *978 none of the cases needed to proceed in New York State courts just because the defendant, Pfizer, Inc., was a New York corporate resident.
In Justice Shulman’s decision in Wilson, which involved the cholesterol-lowering drug Lipitor, there was only one Georgia plaintiff involved in that case. Both Justice Edmead and Justice Shulman were well within their discretion to dismiss those cases where no New York plaintiffs were present because dismissing those cases was dispositive of the entire litigation as none of them were part of a mass tort. Here, however, at least 29 New York plaintiffs will proceed to trial with or without the nonresident plaintiffs. Therefore, dismissing the nonresident plaintiffs will not dismiss the mass tort cases, but merely streamline them.
The defendants have recently disclosed that one of the Florida plaintiffs who filed in this court has also filed a similar action with other plaintiffs in a Florida circuit court, to illustrate that residents of Florida and residents of other states can file suit in their own state and, therefore, need not be included in this New York mass tort coordinated proceeding. While this may be true, having cases brought in the various county, district or circuit courts of the 50 states and the District of Columbia and Puerto Rico, along with the 91 U.S. district courts is hardly an efficient means to dispose of mass tort cases and is contrary to the trend of how mass tort cases have been resolved.
Mass Torts are Different
Mass torts involve similar claims against the same defendants and are usually coordinated before one judge to maximize judicial economy and the efficiencies of handling the discovery in an organized uniform manner, minimizing the duplication of deposing defendants’ witnesses and the collection of universal data concerning the product.[9]
Mass torts generally are handled as either coordinated matters before one judge, pursuant to an order of the New York Litigation Coordinating Panel (LCP),[10] as with the case here, or, if appropriate, as a class action before one judge.[11] This is also true in the federal courts, where judicial economy dictates that similar cases pending in more than one federal district court be *979 referred to the United States Judicial Panel on Multidistrict Litigation (MDL) for an order of coordination of all the cases before one judge.[12]
As Judge Weinstein pointed out, mass tort litigation is different from litigation involving one or several plaintiffs, as was the case in Jordan and Wilson. A mass tort by its very nature is defined by the numerosity of plaintiffs with common defendants involving the same claims. If the specific facts of each individual claim are not “typical” of all the cases in the group, that may preclude a traditional class action lawsuit.[13] Indeed, in the first round of OxyContin cases, this court denied the application of five plaintiffs to establish a class action because none of the cases were “typical” of the other cases in the manner by which the several physicians prescribed the drug to each claimant and the disparate damages ranging from claims of addiction to suicide. Consequently, those cases were sua sponte referred to the LCP which, in turn, ordered that those cases and any other additional cases filed in any New York State court be coordinated before one judge in one county for discovery, summary judgment and possibly trials. Any trials would be conducted in the counties where the cases were originally filed or before the coordinating judge.[14]
In New York, class actions are not generally employed in tort or mass tort actions. Mass torts are instead coordinated pursuant to the New York Uniform Rules for Trial Courts.[15] The rules consider whether there are common questions of fact or law, the costs to the parties, the saving of time, the risk of duplicative or inconsistent rulings, orders or judgments, the convenience of parties, witnesses and counsel, and the pendency of related matters in the federal and other state courts.[16]
It is important to note at the outset, that these cases find themselves being litigated in this New York State court because the defendants vigorously opposed the original plaintiffs’ counsel’s application to coordinate the initial OxyContin cases before the MDL panel to establish a single federal court to coordinate all of these matters nationwide. Since the defendants were successful in defeating the federal MDL application, there *980 is no federal MDL court handling OxyContin.[17] In virtually every other similar pharmaceutical products liability mass tort cases there are federal MDL coordinating judges handling those cases.[18] Most importantly, even if there was a single coordinating federal court judge, that district court judge would still have the same logistical issues of conducting depositions in various states.
This court appreciates the concern of the defendants that this state court judge would be unduly burdened in handling a mass tort. Of course, the defendants’ remedy to allow each of these cases to be re-initiated in the home states of the plaintiffs is somewhat disingenuous because that would defeat the efficiency achieved by coordinating similar cases in either a federal or state court. As to the burden on the New York courts, all of these cases are coordinated before one judge so that there is not a duplication of efforts in multiple courts and contradictory rulings by multiple judges. That is the very reason why similar cases pending in multiple courts of this state are coordinated before one judge.[19] In New York State courts at this time several judges are acting as coordinating judges in pharmaceutical mass tort cases that include numerous nonresident plaintiffs. Of course, where there is also a federal MDL coordinating judge some of the volume of cases is divided between the federal MDL coordinating judge and the state court coordinating judge. In the New York Bextra and Celebrex mass tort products liability litigation in response to a motion to dismiss the nonresident plaintiffs, Justice Shirley W. Kornreich resolved that application by cooperating with the federal MDL coordinating judge in California and the attorneys to handle all of the New York pending cases east of the Mississippi River, including Louisiana and Min *981 nesota, while the federal MDL coordinating judge would handle all of the New York cases west of the Mississippi River.[20] Here, no such accommodation can be reached because there is no federal MDL judge.
Adding 248 nonresident plaintiffs to the 29 New York plaintiffs in these coordinated cases may create a greater burden on this court by the volume of cases, however, the overall savings of time and effort to the judicial system far outweighs the burdens because the issues are similar and the defendants’ position on all of the cases is virtually identical. Furthermore, the legislature and the courts have a long history in this state of governing business entities conducting business within its borders regardless of whether the plaintiff is a resident of this state.
In the realm of pharmaceutical products liability cases it is common that both federal and state courts act in concert to resolve litigation on such a wide scale. The alternative is to scatter the litigation of these similar cases to the various state and federal jurisdictions throughout the nation, which will create more costs to both plaintiffs and defendants and create disparate rulings on both procedural and substantive matters. While the defense tactic may be “to divide and conquer,” that is against the state and national trend which is to aggregate and resolve these cases in a judicially efficient manner.
Forum Non Conveniens in New York
The New York legislature’s codification of the common-law concept of forum non conveniens or inconvenient forum is in CPLR 327, which states in pertinent part:
“When the court finds that in the interest of substantial justice the action should be heard in another forum, the court, on the motion of any party, may stay or dismiss the action in whole or in part on any conditions that may be just. The domicile or residence in this state of any party to the action shall not preclude the court from staying or dismissing the action.”[21]
New York has long recognized the importance of adjudicating cases involving corporate entities operating within the boundaries of New York. Professor David D. Siegel in his treatise New York Practice commented that Business Corporation Law § 1314 *982 “should be deemed a forum non conveniens statute, although it has sometimes been referred to as going to subject matter jurisdiction.”[22] The plain language of the statute suggests that the legislature anticipated that out-of-state plaintiffs may select New York courts as the forum to police the actions of corporate entities, both foreign and domestic, operating within this state. Therefore, even if this court was inclined to accept the defendants’ argument that they are not now domestic corporations, New York courts may still have the authority to adjudicate cases involving foreign corporations.
The defendants argue that the nonresident plaintiffs do not have a meaningful nexus with the State of New York to justify their choice of jurisdiction in this state. Defendants assert that each OxyContin plaintiff is unique in that each plaintiff requires unfettered access to certain witnesses including each plaintiffs family, friends and doctors. Defendants strongly contend that the appearance of these people during a trial is essential to fulfilling due process requirements.
In stark contrast, the plaintiffs’ counsel strenuously oppose the defendants’ motion arguing that there is a substantial nexus between the defendants and New York to justify their choice of jurisdiction. To begin, the Purdue Frederick Company was incorporated in New York. The plaintiffs point out that at the time defendants created and marketed OxyContin to the public, their research and development facility was operating within the borders of New York. Counsel for the plaintiffs assert that aside from the defendants significant connections with New York, this court is best equipped to handle further OxyContin litigation because this court is well informed of the intricacies of this litigation from its previous experience with this matter. Moreover, there are several procedural devices to obtain the testimony of the necessary witnesses for these matters.
Judicial Discretion
The New York Court of Appeals recognized that it is within the discretion of the trial court to determine which controversies will be resolved in this state: “The question whether ... a suit should be entertained is one which is in general committed to the discretion of the courts below [trial courts], to be exercised *983 by reviewing and evaluating all the pertinent competing considerations.”[23]
The sentiments of the Court of Appeals are echoed by Professor Siegel: “The conveniens doctrine is one of judicial discretion ‘to be exercised by reviewing and evaluating all the pertinent competing considerations’ ... It is mandatory in all cases, however, that all relevant considerations be weighed by the court.”[24]
The doctrine of forum non conveniens enjoys a long history in New York. In Silver v Great Am. Ins. Co., the Court of Appeals evaluated a case in which a nonresident plaintiff from Hawaii sued a New York corporation authorized to do business in Hawaii. The nonresident plaintiffs complaint had two causes of action sounding in defamation and conspiracy. Specifically, the nonresident plaintiff alleged:
“that the defendant, in New York, Hawaii and elsewhere, conspired to injure and defame him and that, as part of the conspiracy, the defendant provided insurance protection, by means of a special ‘libel and slander rider,’ for person who ‘spoke’ of the plaintiff as being ‘a rough technician,’ ‘intellectually dishonest’ and ‘mentally sick.’ ”[25]
In this watershed decision, the Court of Appeals reversed the judicial policy of rejecting forum non conveniens motions based solely on the residency of one of the parties to the action. In addressing the former rule concerning forum non conveniens, the Court of Appeals stated:
“Further thought persuades us that our current rule — which prohibits the doctrine of forum non conveniens from being invoked if one of the parties is a New York resident — should be relaxed. Its application should turn on considerations of justice, fairness and convenience and not solely on the residence of one of the parties. Although such residence is, of course, an important factor to be considered, forum non conveniens relief should be granted when it plainly appears that New York is an inconvenient forum and that another is available which will best serve the ends of justice and the convenience of the *984 parties.”[26]
The language contained in Silver demonstrates that residence is an “important factor,” but it is not the only factor to evaluate. Moreover, here there is no other single convenient forum— only the various sister state courts and the 91 U.S. district courts.

Islamic Republic of Iran v Pahlavi

The plaintiffs and the defendants have both cited to the 1984 decision in Islamic Republic of Iran v Pahlavi[27] where the New York Court of Appeals held that there are several factors a trial court must consider when evaluating a forum non conveniens motion:
“Among the factors to be considered are the burden on the New York courts, the potential hardship to the defendant, and the unavailability of an alternative forum in which plaintiff may bring suit . . . The court may also consider that both parties to the action are nonresidents . . . and that the transaction out of which the cause of action arose occurred primarily in a foreign jurisdiction ... No one factor is controlling.”[28]
“The burden rests upon the defendant challenging the forum to demonstrate relevant private or public interest factors which militate against accepting the litigation.”[29] The defendants point to the dismissal of the plaintiffs case in Islamic Republic of Iran as controlling on this court. But the facts of that case are not similar or analogous. Indeed, no deliberative state court would have ever retained such a case where a foreign government like the Islamic Republic of Iran, which was seeking to try Mohammed Reza Pahlavi, its former foreign head of state, for the atrocities he allegedly perpetrated in Iran and the vast sums of money he allegedly stole while serving as the Shah of Iran. The facts in Islamic Republic of Iran v Pahlavi are hardly analogous to residents of the various states of the United States, its commonwealths and territories suing an American pharmaceutical company in its home state for alleged torts and breaches of warranties committed within the United States. The facts in Islamic Republic of Iran are so *985 dramatically different from the case at bar that the conclusion that the plaintiffs’ cases should be similarly dismissed is not controlling.
Notwithstanding the dissimilar facts, this court has applied the principal factors of Islamic Republic of Iran to this case. Like many American corporations Purdue does have offices in other jurisdictions as well as within New York. But New York is where the Purdue Frederick Company was incorporated, as was Purdue Pharma, Inc. While the corporate headquarters was transferred to Connecticut, its research and development laboratories were still located in New York where OxyContin was created. Hence, New York may be treated as a home state of the defendants. Consequently, discovery of the defendants’ documents and depositions of their scientists are most easily accommodated in New York. The overall judicial economy of using the defendants’ documents collectively in one court that will control and limit the defendants’ depositions to be taken for all cases pending in this court is an overwhelming savings of time and money.
The defendants’ counsel, the law firm of Chadbourne & Parke, LLP, which is handling the OxyContin litigation, is located in New York and represents Purdue throughout the nation, regardless of where the case is filed. Moreover, all of the plaintiffs herein, both residents and nonresidents, are represented by the Sanders Firm, a New York law firm.
Accordingly, it is logical that plaintiffs’ counsel chose a New York State court as the forum to prosecute their claims considering that virtually all of the defendants’ witnesses, coupled with the fact that defendants still operated and conducted the research and development of facilities of OxyContin within New York’s borders.
Procedural Factors
WTiile the plaintiffs and the defendants’ officers and employees may be compelled to come to New York for a deposition or trial, an out-of-state nonparty may resist a New York Supreme Court subpoena to testify. In that event, a deposition may be conducted in the nonresident deponent’s home state on consent or by written questions under oath or with the assistance of the court by the issuance of a commission to conduct a deposition out of state or by letters rogatory, where this state court seeks the assistance of a sister state court to compel the out-of-state *986 nonparty to cooperate in taking a deposition.[30] This process is similar to the federal practice known as a “letter of request.”[31] Professor Siegel explained that commissions or letters rogatory are used to take testimony outside the state and are usually resorted to only when an ordinary deposition will not do the job.[32] A commission or letters rogatory may be sought by ordinary motion before this court. In describing the process for seeking a commission, the Appellate Division, Second Department, stated:
“Although proceeding by deposition upon written questions is a preferred method for conducting an examination outside New York ... its efficacy, like a deposition upon oral questions, is also dependent upon the cooperativeness of the witness and the foreign court. Cognizant of this drawback, CPLR 3108 provides that a commission or letters rogatory may be issued where ‘necessary or convenient’ for the taking of a deposition outside of the State. The commission procedure is available where the notice procedure under the circumstances of the case or the place where the deposition is to be taken may be deemed impracticable or there is some doubt as to whether the deposition may be taken . . . There will be occasions when the party seeking disclosure detects that the judicial imprimatur accompanying a commission will be necessary or helpful when the person he designates to conduct the deposition in accordance with CPLR 3113 seeks the assistance of the foreign court in compelling the witness to attend the examination.”[33]
Furthermore, the legislature recognized that there may be occasions when a witness in a particular action may be unable to appear at the time of trial. To remedy these situations, the legislature specifically allowed for deposition testimony to be used at the time of trial when a witness is unavailable. CPLR 3113 (d) permits the parties to an action to conduct depositions by “telephone or other remote electronic means” to reduce the burdens of questioning wit *987 nesses outside the borders of New York. The CPLR is very liberal in allowing the use of depositions by opposing parties. Indeed, CPLR 3117 (a) (2) allows a party’s deposition to be used “for any purpose” by any adverse party without any foundation that the party is unavailable to testify. In addition, the traditional reasons of unavailability due to being out of the jurisdiction are also available under CPLR 3117 (a) (3). Moreover, CPLR 3117 (a) (4) allows the deposition of a medical practitioner to be utilized without the necessity of showing unavailability or special circumstances. While deposing treating physicians who are not parties to the action in New York State proceedings is a rare exception in the discovery phase of a tort case, video depositions are commonly used to capture the testimony of physicians so that the doctor need not appear for live testimony at a trial. In this case, the treating physicians would be the typical nonparty out-of-state witnesses. The logistics of capturing their testimony would be the same if those cases were pending in a federal or other state court.
With reference to the volume of cases and the need for the same witnesses to testify at each trial, CPLR 4517 allows prior testimony in a civil action to be used again in other matters involving the same parties or their representatives and arising from the same subject matter.[34]
The aforementioned statutory provisions clearly demonstrate that the defendants’ purported due process argument concerning inability to offer the testimony of nonresident witnesses is without basis. It is clear that the state legislature not only anticipated that such instances may arise in the course of litigation, but adequately created remedies to those anticipated problems. The defense arguments that commissions are burdensome may be true, but not more burdensome than prosecuting these cases in 50 state courts and/or 91 U.S. district courts.
Conclusion
It is the finding of this court that the defendants have not met their burden in proving that this court is an inconvenient forum to try the non-New York plaintiffs’ cases in this mass tort. Indeed, this court finds that given all the facts and circumstances, this court is a most convenient forum in which to present all of these cases.
*988 Accordingly, it is hereby ordered that the defendants’ motions to dismiss all of the non-New York plaintiffs’ cases concerning the drug known as OxyContin now pending in this court are denied.

. Matter of OxyContin, 15 Misc 3d 388 (2007).

. Since all of the 1,117 cases in the original round of cases have been resolved, which were collectively known as “In re OxyContin” under index No. 700000/2005, this second round of cases shall hereinafter be known as “In re OxyContin II” with a coordinated index No. of 700000/2007.

. DES is the abbreviation for diethylstilbestrol, a synthetic estrogen prescribed to millions of pregnant women in the United States from 1938 to 1971.

. In re DES Cases, 789 F Supp 552, 561 (ED NY 1992) (citations omitted).

. Id. at 561-562.

. Defendants’ mem of law in support of motion at 5.

. NYU, Aug. 17, 2007, at 26, col 1 (Sup Ct, NY County).

. 20 Misc 3d 1104(A), 2008 NY Slip Op 51214(D) (Sup Ct, NY County 2008).

. See Federal Judicial Center, Manual for Complex Litigation § 22.8 et seq. (4th ed 2004).

. See Uniform Rules for Trial Cts (22 NYCRR) § 202.69 (b) (3) et seq.

. CPLR 901, 902 et seq.

. 28 USC § 1407.

. See Hurtado v Purdue Pharma Co., 6 Misc 3d 1015(A), 2005 NY Slip Op 50045(U) (Sup Ct, Richmond County 2005).

. Id.

. See Uniform Rules for Trial Cts § 202.69 et seq.

. Id.

. In re Oxycontin Prods. Liab. Litig. (No. II), 395 F Supp 2d 1358 (JPML 2005).

. The federal MDL panel has assigned a single coordinating judge to handle the volume of the following pharmaceutical or medical device products liability cases: Agent Orange; Showa Denko K.K. L-Tryptophan; asbestos; factor VIII or IX concentrate blood products; orthopedic bone screw; diet drugs (fenfluramine/phentermine/dexfenfluramine) (Fen-Phen); Rezulin; Propulsid; methyl tertiary butyl ether; St. Jude Medical, Inc., Silzone heart valves; Sulzer Orthopedics, Inc., hip prosthesis and knee prosthesis; phenylpropanolamine (PEA); Baycol; Serzone; Meridia; Prempro; Paxil; Zyprexa; Ephedra; deep vein thrombosis; Accutane; Vioxx; Bextra and Celebrex; Guidant Corp. implantable defibrillators; Viagra; Medtronic, Inc. implantable defibrillator; Celexa and Lexapro; Ortho Evra; Aredia and Zometa; human tissue; Seroquel; Bausch & Lomb Inc. contact lens solution; Fosamax; and Kugel mesh hernia patch.

. Uniform Rules for Trial Cts § 202.69.

. See Matter of New York Bextra & Celebrex Prods. Liab. Litig., Sup Ct, NY County, Aug. 2, 2006, Kornreich, J., index No. 560001/2005.

. CPLR 327 (a).

. Siegel, NY Prac § 29, at 34 (4th ed).

. Varkonyi v S.A. Empresa De Viacao Airea Rio Grandense (Varig), 22 NY2d 333, 337 (1968) (citations omitted).

. Siegel, NY Prac § 28, at 31 (4th ed).

. 29 NY2d 356, 359 (1972).

. Id. at 361.

. 62 NY2d 474 (1984).

. Id. at 479 (emphasis added).

. Id.

. See CPLR 3108.

. See Fed Rules Civ Pro rule 28 (b).

. Siegel, NY Prac § 360, at 589-590 (4th ed).

. Wiseman v American Motors Sales Corp., 103 AD2d 230, 235 (2d Dept 1984).

. See CPLR 4517.